IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
PROFESSIONAL RECOVERY        :     HON. JEROME B. SIMANDLE
SERVICES, INC.,              :
                            :     Civil No. 06-2829 (JBS)
            Plaintiff,       :
                            :
      v.                     :          OPINION
                            :
GENERAL ELECTRIC CAPITAL     :
CORPORATION and PATRICIA     :
SMITH,                       :
                            :
            Defendants.      :
                            :
```

Stephen J. DeFeo, Esq.
BROWN & CONNERY, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
      Counsel for Plaintiff Professional Recovery Services, Inc.

Francis F. Quinn, Esq.
LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO
420 Lexington Avenue
New York, NY 10170
      Counsel for Defendant General Electric Capital Corporation

James A. Rocco, III, Esq.
LAW OFFICES OF JAMES A. ROCCO, III
5505 Marlton Pike
Marlton & Lexington
Pennsauken, NJ 08109
      Counsel for Defendant Patricia Smith

**SIMANDLE**, District Judge:

      This matter is before the Court on four motions with
overlapping areas of concern.  Plaintiff Professional Recovery
Services, Inc. ("Plaintiff" or "PRS") has moved for partial
summary judgment on Plaintiff's breach of contract claim against
Defendant General Electric Capital Corporation, doing business as

General Electric Consumer Finance ("Defendant GE") [Docket Item 54], and Defendant GE has filed a cross-motion for summary judgment on that breach of contract claim [Docket Item 66]. Plaintiff also filed a motion for determination of choice of law on Plaintiff's defamation claims against Defendant GE and Defendant Patricia Smith ("Defendant Smith") [Docket Item 62]. Finally, Defendant GE moved for summary judgment on all claims against it [Docket Item 63].  For the reasons set forth below, the Court will grant summary judgment in favor of Defendant GE on all counts, and will apply New Jersey law to determine liability on Count I (defamation) against Defendant Smith.

I.   **BACKGROUND**

   A.   **Facts**

   Except with regard to the circumstances related solely to Plaintiff's breach of contract claim, the facts as recounted will be presented in the light most favorable to Plaintiff, as the non-moving party.  Plaintiff is a debt collector that contracts with banks, lenders and credit issuers to collect debts due from their customers.  It is a New Jersey corporation with its principal place of business in New Jersey.  Defendant Smith is a former PRS employee, who was fired in June, 2005 on the grounds of poor performance.  (Smith Dep., Pl. Ex. 54B[1] at 29.)  At the

_____

   [1] Given the numerous submissions related to the four motions to be decided, each of Plaintiff's exhibits will be identified by its letter (in this case "B") and the docket number of its

time relevant to this action, Smith was a resident of Philadelphia, Pennsylvania.  (Movish Dep. 2007, Pl. Ex. 54A at 18.)  Defendant GE is a unit of General Electric Company, and a provider of credit services to consumers, retailers and auto dealers.  GE is a Delaware corporation with its principal place of business in Connecticut.  In January, 2004, Plaintiff entered into a contract with Defendant GE entitled "Collection Agreement - Agency" for the provision of debt collection services ("the Contract").  (Contract, Def. Ex. C.)  As of June, 2005, among Plaintiff's other clients were the banks Wells Fargo and JP Morgan Chase.  (John McCusker Dep., Def. Ex. E at 361-64.)

On June 22, 2005, Defendant Smith called Defendant GE's customer service department from her home in Philadelphia and was directed to Janine Movish, Senior Manager of Special Investigation in Law Enforcement and Fraud for Defendant GE, who was based in Ohio.  (Movish Dep. 2007, Pl. Ex. 54A at 9-10, 16-17, 18, 138; Movish Dep. 2006, Def. Ex. B at 23-25; Smith Dep., Pl. Ex. 54B at 89.)  During the course of that conversation, Smith told Movish she was concerned that certain PRS employees were stealing confidential PRS client information (based on conversations she overheard), which might include Defendant GE

---

related motion (in this case, docket item 54, Plaintiff's motion for summary judgment on breach of contract against Defendant GE). Defendant GE's exhibits are all included in their motion for summary judgment, docket item 63.

information. (Smith Dep., Pl. Ex. 54B at 93-94; Movish Dep. 2006, Def. Ex. B at 26-27.)  Smith also suggested that this fraud was intended to fund the drug and alcohol habits of PRS employees. (Movish Dep. 2006, Def. Ex. B at 27-28.)  Smith told Movish that she used to work for PRS but had left voluntarily.  (Id. at 27.)

Later that same day, after conferring with more senior management at GE, Movish and a senior debt recovery manager at GE, Jeff Brethauer, spoke with Smith again, and Smith suggested that PRS employees were selling debtor account numbers.  (Movish Dep. 2006, Def. Ex. B at 31, 33-35; Brethauer Dep., Def. Ex. K at 141-42.)  Movish asked Smith to file a police report concerning her allegations against PRS employees.  (Movish Dep. 2006, Def. Ex. B at 35-36, 47-49.)  Before ending their conversation, Movish asked Smith to send her documentation of her allegations. (Movish Dep. 2007, Pl. Ex. 54A at 185-86.)

Immediately after speaking with Smith on June 22nd, Movish contacted her superior, Peter Costa, Enterprise Security Leader for Defendant GE's business in the Americas, who then informed numerous business managers at GE of Smith's contact.  (Movish Dep. 2006, Def. Ex. B at 31, 33-35; GE Communications, Def. Ex. J at 188.)

On June 23, 2005, in response to Movish's request, Smith faxed to Defendant GE and Movish: (1) a letter setting forth her allegations of theft, along with several unrelated allegations,

4

(2) a PRS employee list, (3) a memorandum on PRS letterhead outlining the "PRS Call Out Policy" (company policy regarding absence and lateness), (4) a memorandum regarding Target Financial accounts, (5) a flyer describing the PRS "Check-by-Phone Contest" (an employee incentive contest) within the department handling GE accounts, along with contest results, (6) a memorandum from the GE department managers at PRS to collectors regarding documentation to be sent to debtors, (7) three letters on PRS letterhead signed by Defendant Smith and directed towards Defendant GE's debtors, (8) one letter from a law firm regarding a debtor and directed towards Plaintiff, and (9) a series of hand-written letters from a debtor to Smith.  (Smith Fax, Pl. Ex. 54E.)  Of the documents sent by Smith to Movish, all were acquired by Smith during her employment at PRS and Smith has admitted that she kept the information subsequent to her termination, a fact of which Movish was aware.  (Smith Dep., Pl. Ex. 54B at 151-53; Movish Dep. 2007, Pl. Ex. 54A at 144, 186.)

Smith's letter to Movish includes the following attacks against Plaintiff:

- "[D]uring our breaks and lunch away from our desk several employees left important documents from your clients on there [sic] desk unattended for anyone to retrieve, and take with them and steal identity [sic]."

- "I observed during my breaks and lunch times, conversations going on with co-workers about taking down account numbers and selling them to people, these are employees who are known to do

drugs and are alcoholics and drink and do drugs during working hours."

- A more senior PRS employee cursed at Smith and "said he was going to kick my F--en A--" and her supervisor did nothing.  When Smith threatened her supervisor with a lawsuit, the supervisor put a note in her file and said it was inappropriate to threaten him with a lawsuit.  Smith concluded that her supervisor was "an older southern man" who thought that a "woman is always wrong until proven otherwise."

- The owner of PRS enjoys various "perks" for being a female business owner, drives an expensive car, and stayed in her office.

- "The daily use of foul language, the fighting on the floor, [sic] one incident that was reported was a male collector . . . taking a female employee and pushing her into a desk & put his hand around her neck and choking her, where she ran for her safety to the roof of the building, and a police report was filed and he was arrested and taken out in handcuffs."

(Id.)  Defendant Smith concluded:

I'm hoping that during your investigating [sic] this matter you find that this companies [sic] policies are not what collections is all about working in the field for several years and working for some of the best companies I found this one to be the worst, not regulated by the owners and the staff they hire, there [sic] methods are very unconstitutional and not very friendly, most of all breaking all or most of the FDCPA law and regulation, which protect your clients from harassment, verbal abuse and down right unlawful tactics of how they collect.

(Id.)  Finally, in a post script, Smith wrote:

FDCPA - Violations
         #806 Harassment or Abuse
         #807 False or misleading representations
         Mini-Miranda not read on every call

Smith also filed a police report with the Voorhees, New Jersey police department, as requested.  (Smith Dep., Def. Ex. D at 92-93; Police Report, Def. Ex. L.)  The report reads:

> [Smith] had reported that employees of Professional Recovery Service are possibly stealing and using SS#s from the company.  Mrs. Smith stated she had no proof but may have heard other employees talking about selling SS#s to drug dealers etc.  She had no proof but wished to file this report for future reference.  I advised her that the companies (Wells Fargo & Bank One) have their own security and the victims will file a complaint.  Right now there are no victims or complaints.

(Police Report, Def. Ex. L.)

That same day, June 23, 2005, Defendant GE recalled all of its accounts from PRS.  (Brethauer Dep., Def. Ex. K at 61, 149; Def. Ex. O.)  On June 27, 2005, Movish contacted Wells Fargo in Des Moines, Iowa, and Chase in Wilmington, Delaware, about Smith's allegations.  (GE Communications, Def. Ex. J at 3; Movish Dep. 2007, Pl. Ex. 54A at 25-29.)

On June 29, 2005, Defendant GE contacted the United States Secret Service to discuss Smith's allegations.  (Movish Dep. 2006, Def. Ex. B at 84-87.)  At that point, Defendant GE and Movish knew that the Voorhees police department had decided not to investigate the matter because there was insufficient evidence.  (Id. at 75.)

Later that same day, Movish spoke with Karen Trimmer, Vice President of Investigations for Credit at Chase, who returned her call.  (Movish Dep. 2006, Def. Ex. B at 77-79; GE Communications,

7

Def. Ex. J at 4.)  Movish told Trimmer about Smith's allegations and provided her with the material that Smith had faxed. (Movish Dep. 2007, Pl. Ex. 54A at 160-61.)  Similarly, by the morning of June 30th, Movish had also communicated with Wes Camp, the Operational Risk Manager for Wells Fargo, and passed on Smith's allegations along with the faxed documents.  (Movish Dep. 2007, Pl. Ex. 54A at 154-57; Pl. Ex. 63F at 2.)  Neither Movish nor Defendant GE contacted PRS before conveying the allegations and the Smith documents to Wells Fargo and Chase.

On July 7, 2005, Equifax reported that there had been no unusual fraud on Defendant GE's accounts with PRS.  (Movish Dep. 2006, Def. Ex. B at 108-09.)  On July 12, 2005, Movish learned from the Secret Service that they found insufficient evidence to open a formal case against Plaintiff.  (Id. at 114-16.)  Smith "did not have any specifics," "could not provide the client [the PRS employees] were stealing from nor which employees were the ones that were overheard" and "could not provide [the Secret Service] any other employees names that he would be able to corroborate her story."  (Id. at 115.)  Movish observed at the time: "[Secret Service Agent Jeff Lowe] spoke with the ex-employee and unfortunately she did not offer much information." (Movish Dep. 2006, Def. Ex. B at 108-09; Pl. Ex. 63R at 95.) Neither Defendant GE nor Movish informed Chase or Wells Fargo of the Equifax results, or the conclusions of the Voorhees police

department and the Secret Service that Smith's allegations did not warrant an investigation.  (Movish Dep. 2007, Pl. Ex. 54A at 170-72.)

On July 12, 2005, the Quality Assurance Department at Wells Fargo prepared an inter-office memo finding that, based on an ad-hoc review, PRS presented a risk and agreeing with Retailer Management that the "risk" should be "eliminate[d]" "within the next 90 days via replacement."  (Wells Fargo Memo, Pl. Ex. 63 K.) This action was taken notwithstanding the results from a formal Wells Fargo audit prepared in June, 2005, giving PRS an overall "satisfactory" rating and a risk rating of "low risk."  (Audit, Pl. Ex. 63 N.)  Wells Fargo did not officially terminate their contract with PRS until November, 2005.  (Def. Ex. CC at 2174.) On July 13, 2005, Chase terminated their contract with PRS. (Irene Kelso Dep., Pl. Ex. 63L at 109.)

On July 14, 2005, Peter Costa sent an e-mail to various leaders and legal counsel at GE stating "We have completed our investigation and believe there was no breach of customer data." (Movish Dep. 2006, Def. Ex. B at 118.)  He later testified that Defendant GE determined "there was no corroborative evidence and there was no incident."  (Costa Dep., Pl. Ex. H at 77.)

At all relevant times, Defendant GE has an Information Security Program ("ISP") to be applied "when an actual or potential security breach occurs, including unauthorized access

to, or use of customer information that could result in substantial harm or inconvenience to a customer." (ISP, Pl. Ex. Q at 15.) "If the breach involves unauthorized access to or use of sensitive customer information" of a GE banking institution, the Enterprise Security Leader must promptly notify the appropriate primary banking regulator (the FDIC for GE Capital Financial and the Office of Thrift Supervision ("OTS") for GE Money Bank). (Id.) In addition, "[a] Suspicious Activity Report should be filed if the nature of the incident would otherwise require filing a SAR." (Id.) Moreover, customer notification is often required. (Id. at 16.) "At a minimum, [GE] banking institutions must provide notice to affected customers if the bank reasonably concludes that misuse has occurred or is reasonably possible, and the incident involves 'sensitive customer information.'" (ISP, Pl. Ex. Q at 15; Costa Dep., Pl. Ex. 63H at 73.)

Defendant GE did not report Smith's allegations to the OTS. (Movish Dep. 2007, Pl. Ex. 54A at 135.) Defendant GE did not file a SAR in relation to Smith's allegations. (Costa Dep., Pl. Ex. 63H at 26.) Defendant GE did not notify any of its customers about the alleged fraud taking place at PRS. (Movish Dep. 2007, Pl Ex. 54A at 136; Costa Dep., Pl. Ex. 63H at 36.)

**B.    Procedural History**

On June 22, 2006, Plaintiff brought suit in this case.  On February 12, 2007, Plaintiff filed an amended complaint and discovery proceeded.  Against Defendant GE, Plaintiff asserts claims of defamation (Count II), tortious interference with business relations (Count IV), breach of contract (Count VI), and negligence (Count VII).  Against Defendant Smith, Plaintiff asserts claims of defamation (Count I), tortious interference with business relations (Count III), and breach of contract (Count V).  The four motions at issue arrived in November and December, 2008.  First, Plaintiff moved for partial summary judgment on its breach of contract claim against Defendant GE (Count VI) [Docket Item 54].  Next, Plaintiff filed a motion for determination of law with respect to its defamation claims against both defendants (Counts I and II) [Docket Item 62].  At the same time, Defendant GE moved for summary judgment on all claims except Plaintiff's breach of contract claim [Docket Item 63].  The next day, Defendant GE submitted its cross motion for summary judgment on the breach of contract claim [Docket Item 66].[2]  The Court will address each claim.

---

[2] Defendant Smith has not filed a dispositive motion, nor has she opposed Plaintiff's motion for determination of choice of law as to the defamation claim against her.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

### B.  Defamation Against Defendants GE and Smith

With respect to Plaintiff's defamation claims, the parties have presented the Court with two questions: first, what law is to be applied to the issue of fault; and second, whether Defendant GE is entitled to summary judgment on that claim.  The Court has narrowed the question as to Defendant GE, for all

12

parties agree that New Jersey law applies to the issue of
qualified privilege and because the Court concludes that
Defendant GE is entitled to a qualified privilege that Plaintiff
cannot overcome, it is unnecessary to determine what law governs
the issue of fault as against Defendant GE.  The Court must still
determine what law to apply to Plaintiff's defamation claim
against Defendant Smith, and the Court concludes that New
Jersey's negligence standard will apply to that claim.

    1.   Summary Judgment for GE and Qualified Privilege

Defendant GE maintains that, whatever law governs
Plaintiff's prima facie case, it is entitled to the affirmative
defense of "common interest" qualified privilege.  The privilege,
which all parties agree is applicable in similar form in all
states related to this claim, will be governed by New Jersey
law.[3]  The New Jersey Supreme Court has defined the qualified
privilege as follows:

> A communication 'made bona fide upon any
> subject-matter in which the party communicating has
> an interest, or in reference to which he has a
> duty, is privileged if made to a person having a
> corresponding interest or duty, although it
> contains criminatory matter which, without this
> privilege, would be slanderous and actionable....'

---

[3] Simpler v. El Paso Polyolfins, Co., 1986 WL 4575, at *2-3
(Del. Super. Ct. Apr. 3, 1986); Knudson v. Chicago & NorthWestern
Transp. Co., 464 N.W.2d 439, 442-43 (Iowa 1990); A & B-Abell
Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades
Council, 651 N.E.2d 1283, 1290 (Ohio 1995); Miles v. Perry, 529
A.2d 199, 205 n.8 (Conn. App. Ct. 1987).

Williams v. Bell Tel. Lab. Inc., 623 A.2d 234, 240 (N.J. 1993)
(quoting Coleman v. Newark Morning Ledger Co., 149 A.2d 193, 202
(N.J. 1959)).  This common law privileged "arises out of a
legitimate and reasonable need, in particular situations, for
private people to be able freely to express private concerns to a
limited and correlatively concerned audience, whether or not
those concerns also touch upon the public interest in the broad
sense." Bainhauer v. Manoukian, 520 A.2d 1154, 1169 (N.J. Super
Ct. App. Div. 1987).

     "Whether or not a statement is privileged is a question of
law for the Court to decide." Kadetsky v. Egg Harbor Tep. Bd. of
Educ., 82 F. Supp. 2d 327, 344 (D.N.J. 2000) (citing Bainhauer,
520 A.2d at 1171).  The test to determine whether a communication
is entitled to the common interest privilege requires the Court
to look to (1) the appropriateness of the occasion on which the
defamatory information is published, (2) the legitimacy of the
interest thereby sought to be protected or promoted, and (3) the
pertinence of the receipt of that information by the recipient.
Bainhauer, 520 A.2d at 1170.

     Plaintiff does not argue, nor could it, that the qualified
privilege is inapplicable to Defendant GE's communication to the
fraud and risk management departments at Chase and Wells Fargo.
Defendant GE, and Movish in particular, had a legitimate interest
and duty to prevent consumer fraud and in particular, the theft

of sensitive financial records.  Trimmer and Camp shared this
common interest and duty.  The tremendous public interest in
preventing this sort of crime requires that those charged with
responding to consumer security threats within the financial
industry be permitted to engage in self-regulation without
excessive fear of defamation.[4]  See Bainhauer, 520 A.2d at 1170-
71.  The Court sees a parallel in Bainhauer, where the New Jersey
Appellate Division found that a surgeon's report to his

---

[4] New Jersey has recently emphasized the importance of
preventing identity theft and the degree to which this crime
threatens the public well-being.  See Burnett v. County of
Bergen, --- A.2d ----, 2009 WL 1107899 (N.J. April 27, 2009)
(noting the public's vital interest in preventing identity theft,
even weighed against the public's right to public documents under
Open Public Records Act, required that individual's social
security numbers be redacted from the requested public
documents).  The Supreme Court found the risk of identity theft
particularly "alarming" and observed:

> Nearly ten million Americans -- almost five percent
> of the adult population in the United States -- had
> been   victimized   by   identity   theft   during   a
> twelve-month period from 2002 to 2003.  Of those,
> 3.25 million had their personal information misused
> to open new accounts, obtain new loans, or commit
> theft,  fraud  or  other  crimes.   According  to  a
> different   survey,   about   8.3   million   adults
> discovered they were victimized by identity theft
> in 2005.

Id., 2009 WL 1107899, at 12 (internal citations omitted).  In
fact, the New Jersey legislature, when enacting the Identity
Theft Prevention Act in 2005, observed that "identity theft is an
act that violates the privacy of our citizens and ruins their
good names: victims can suffer restricted access to credit and
diminished employment opportunities, and may spend years
repairing damage to credit histories."  N.J. Stat. Ann. § 56:11-
45(d).

supervisor and fellow surgeons at a hospital regarding poor performance by an anesthesiologist was entitled to a qualified privilege, given the public's interest in quality healthcare. Id. (cited with approval in Fees v. Trow, 521 A.2d 824, 828 (N.J. 1987). Just as the surgeon in Bainhauer, Defendant GE's fraud division had a practical, legal, and "moral duty" to prevent identity theft and report the risk to those with the same duty in the same industry. See Bainhauer, 520 A.2d at 1170-71; Berrios v. PNC Bank, No. L-2372, 2006 WL 2933899 (N.J. Super. Ct. App. Div. Oct. 16, 2006) (bank had duty to protect its client's confidential information and therefore had an "implicit qualified privilege" to communicate security concerns to third party security agency). Defendant GE's statements, therefore, are entitled to qualified privilege.

That common interest privilege is not absolute and this is where the parties' arguments are focused. Plaintiff maintains that there is sufficient evidence from which a reasonable jury could conclude that Defendant GE abused its privilege and so is not entitled to its protection. Defendant GE insists that Plaintiff cannot overcome the qualified privilege hurdle and so it is entitled to summary judgment. The Court agrees with Defendant GE and, for the foregoing reasons, will grant it summary judgment on Plaintiff's defamation claims. In doing so, the Court recognizes that the Supreme Court of New Jersey favors

16

summary judgment for non-meritorious defamation claims, given that such claims compromise First Amendment values.  Rocci v. Ecole Secondaire Macdonald-Cartier, 755 A.2d 583, 588 (N.J. 2000).

The qualified privilege is abused where: (1) the publisher knows the statement is false or the publisher acts in reckless disregard of its truth or falsity; (2) the publication serves a purpose contrary to the interests of the qualified privilege; or (3) the statement is excessively published.  Williams, 623 A.2d at 240.  The privilege is also abused where the publisher "'does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given.'"  Govito v. West Jersey Health Sys., Inc., 753 A.2d 716, 726 (N.J. Super. Ct. App. Div. 2000) (quoting Bainhauer, 520 A.2d at 1173)).  It is the plaintiff's burden to prove by clear and convincing evidence that the privilege has been abused.  Williams, 623 A.2d at 240. Moreover, "a qualified privilege is favored with a presumption that there was no express malice." Fees, 521 A.2d at 830.

First, Plaintiff argues that a reasonable jury could find there is clear and convincing evidence, construing the facts in the light most favorable to Plaintiff, that Defendant GE proceeded with actual malice -- that is, that GE knew that Smith's allegations were false or published them in reckless disregard for their truth or falsity.  The Court disagrees.

17

Reckless disregard presents a high bar, as described by the Supreme Court of New Jersey:

> To prove publication with reckless disregard for the truth, a plaintiff must show that the publisher made the statement with a "high degree of awareness of [its] probable falsity," or with "serious doubts" as to the truth of the publication. To be actionable, "the recklessness in publishing material of obviously doubtful veracity must approach the level of publishing a 'knowing, calculated falsehood.' "

Lynch v. New Jersey Educ. Ass'n, 735 A.2d 1129, 1135-36 (N.J. 1999).  "While negligent publication does not satisfy the actual-malice test, a finding of reckless publication may result if the publisher either fabricates a story, or publishes a story or accusation that is wholly unbelievable, or relies on an informant of dubious veracity, or purposely avoids the truth." Gray v. Press Commc'ns, LLC, 775 A.2d 678, 684 (N.J. Super. Ct. App. Div. 2002) (citing Lynch, 735 A.2d at 1136).  Nevertheless, "[m]ere failure to investigate all sources does not prove actual malice." Lynch, 735 A.2d at 1136.  Plaintiff's evidence may establish that Movish and her colleagues were negligent in their investigation of Smith's claims, but no fact-finder could conclude that they proceeded with reckless disregard for the truth.

The undisputed facts establish that Movish took the following steps before contacting Chase and Wells Fargo.  She interviewed Smith twice, the second time including her colleague

18

Brethauer.  She asked for, and received, a written statement documenting Smith's allegations along with documents that suggested she was a former PRS employee as claimed.  She also insisted Smith make, and received proof that Smith made, a formal report with the police.  Moreover, her communications with Chase and Wells Fargo were relatively limited.  She conveyed Smith's allegations, but did not offer any independent determination as to their truth or falsity.[5]  This conduct does not "approach the level of publishing a 'knowing, calculated falsehood'" and so cannot constitute reckless disregard for the truth.  See Lynch, 735 A.2d at 1135-36.

Plaintiff's various arguments to the contrary are not persuasive.  It may be true that Smith was a disgruntled former PRS employee, but Plaintiff concedes that Smith told Movish that she had left PRS voluntarily.  As discussed above, Movish required and received proof of Smith's employment at PRS.[6]  The

---

[5] For example, Plaintiff highlights an e-mail from Movish to Wes Camp which states (with emphasis added by the Court), "one of the employees at the agency [PRS] are allegedly stealing their data as well."  (Pl. Ex. 63E.)

[6] Plaintiff declares that Movish should have come to PRS to investigate the truth of Smith's accusations and to learn the reason for her termination.  Nevertheless, Plaintiff offers nothing to contradict Defendant GE's explanation (offered through the testimony of Peter Costa, GE's Enterprise Security Leader) that they feared PRS management might be involved in the misconduct and that they did not want to impede the law enforcement investigation.  (Costa Dep., Def Ex H at 102-08.) Plaintiff "cannot show 'actual malice' merely by presenting evidence that a defendant negligently published a defamatory

fact that Movish, initially, had some doubts as to whether Smith
was telling the truth is not evidence that she has serious doubts
at the time she spoke with Chase and Wells Fargo[7] -- to the
contrary, had Movish immediately believed Smith without question
might have suggested that Movish was avoiding the truth.
Instead, she sought and received proof of Smith's credibility.
Moreover, Movish's knowledge that the Voorhees police believe
they needed more evidence to pursue a criminal investigation has
little bearing on whether or not Smith's statements were, in

---

statement without conducting an adequate investigation concerning
its truthfulness." Standridge v. Ramey, 733 A.2d 1197, 1202
(N.J. Super. Ct. App. Div. 1999).

[7] The portion of Movish's deposition cited by Plaintiff as
evidence that she "admitted that at the time of publication she
had doubts about Smith's truthfulness" proves no such thing, but
instead only shows at that the "outset" she had "some questions"
about the truth of Smith's charges.  (Pl. Opp'n to Summary
Judgment at 16.)  The relevant exchange reads as follows:

> Q.   Did you have questions about Mrs. Smith's
>      veracity from the outset in a negative or
>      positive way?
> A.   No.  I didn't have any questions.
> Q.   Did you think it was important to check and
>      see if she was telling the truth?
> A.   Yes.
> Q.   And you took steps to do that, right?
> A.   Yes.
> Q.   So from the outset, it's it fair that you had
>      some questions about whether she was telling
>      the truth?
> A.   Yes.

(Movish Dep. 2007, Pl. Ex. 54A at 211.)

fact, truthful.[8]  The Court further sees no material inconsistencies between Smith's statements to Movish and the police report, but instead sees the overall consistency between the two as evidence to support Smith's credibility (additional details regarding the risk to customers social security numbers notwithstanding).  Finally, Movish's failure to disclose the results of the criminal investigations to Chase and Wells Fargo is likewise not evidence that she was reckless with regards to the truth of the allegations she conveyed to the two banks, but only shows that she saw no need to allay any fears of her competitors caused by Smith's allegations once the risk had passed.  Plaintiff has offered no evidence to suggest that Movish had any duty to convey this information.  In sum, Plaintiff's evidence does not amount to clear and convincing evidence from which a reasonable jury could find that Defendant GE was reckless as to the truth or falsity of Smith's allegations.[9]

---

[8] In fact, the police themselves explained to Smith that they would not investigate, at least in part, because "the companies have their own security."  (Police Report, Def. Ex. L.)

[9] The Court will very briefly address Plaintiff's final argument regarding recklessness, which is to speculate that Movish was motivated not by her interest in protecting consumers from identity theft, but only because she wanted "credit" for uncovering a large fraud ring.  (Pl. Opp'n to Summary Judgment at 17-18.)  The Court finds no facts to support this speculation. Nothing in the record suggests that Movish was hiding the nature of her investigation into this matter (even if her emails did not provide exhaustive lists of every document exchanged), or that her communications to Chase and Wells Fargo were contrary to any specific instructions she received, (Costa Dep., Pl. Ex. H at 94-

Case law, even the cases cited by Plaintiff, support the Court's conclusion.  Plaintiff relies heavily on Gray, but the facts of that case are of no assistance here.  775 A.2d at 682. The defendant in Gray, after calling a children's televison host a "lesbian cowboy" on the radio, claimed that he learned of the plaintiff's sexual orientation through conversations with "the next door neighbor and friends or something" of his in-laws, a conversation he overheard between unknown individuals at some unknown time, and another conversation overheard between unknown comedians.  Id.  The defendant was never able to identify any of his supposed sources, which is what led the Appellate Division to label them "dubious" and even possibly fabricated.  Id. at 682, 685.  In the case at bar, Smith was not only readily identifiable, but also provided her personal contact information, a written statement, and a demonstrated commitment to her allegations by contacting the police.  The Court finds Smith was not sufficiently "dubious" to make Movish's reliance on her allegations reckless.  See id. At 684-85.

---

98, 100).  Finally, Movish's e-mail reporting on the results of the Secret Service's interview with Smith, in which Movish observed that "unfortunately [Smith] did not offer much information," (Pl. Ex. 63R at 95), can only be given its plain meaning -- that more information of any kind would be better than not much information -- and is not evidence that Movish hoped for a fraud ring.  Nevertheless, even if Movish hoped to uncover a fraud ring and reap the rewards of such a discovery, this does not suggest that she would recklessly proceed regardless of the truth and thereby risk the reputation Plaintiff speculates she was so energetically trying to build.

Similarly, in <u>Hopkins v. City of Gloucester</u>, 817 A.2d 436, 442 (N.J. Super. Ct. App. Div. 2003), the defendant testified that he actually knew his statements were false.  Here, there is no evidence of actual knowledge, nor has Plaintiff argued that Defendant GE knew the allegations were false.  By contrast, in <u>Turf Lawnmower Repair, Inc. v. Bergen Record Corp.</u>, 644 A.2d 417, 424-26 (N.J. 1995), the court granted summary judgment in favor of defendants, even though defendant's reporter omitted relevant information, relied on only biased sources, and was "totally unprofessional."  Though the court concluded that the defendant's conduct might be "negligent or even grossly negligent," the plaintiff had failed to submit sufficient evidence to show actual reckless disregard for the truth.  <u>Id.</u> at 26.  Likewise here, Defendant GE performed something of a slap-dash investigation, one that was conceivably negligent, but a reasonable fact-finder could not conclude that Plaintiff has shown recklessness by clear and convincing evidence given the undisputed steps taken by GE to verify Smith's authenticity as a former employee who had the opportunity to observe what she claimed.  <u>See</u> <u>id.</u> at 26.

Next, Plaintiff suggests that a reasonable jury could find that Defendant GE did not share Smith's allegations with Chase and Wells Fargo for the purpose of protecting consumers from identity theft and fraud.  Even if the Court accepts Plaintiff's argument that Costa and Movish had slightly different motives in

23

communicating with Chase and GE, both of these motives were sufficiently related to the purpose of the privilege.  According to Plaintiff, Costa believed the "sole purpose" for communicating with Chase and GE was to get information to assist in GE's investigation of the potential risk to clients, whereas Movish shared this information as a "business courtesy."  (Pl. Opp'n to Summary Judgment at 21-22.)  Both motives, however, serve the purpose of preventing identity theft, either to GE customers or to Chase and Wells Fargo customers, or both.  The qualified privilege is abused if "the matter published consists of statements having no value in effecting the purpose that justifies the privilege."  Restatement (Second) of Torts § 605, cmt. a (cited with approval in Bainhauer, 520 A.2d at 1173).  Whatever motives Movish might have had, there is no evidence that Defendant GE's publication of Smith's allegations had "no value" in avoiding the risk of identity theft.  See Restatement (Second) of Torts § 605, cmt. a.

Finally, there is no evidence from which a jury could conclude that Defendant GE "did not reasonably believe [communicating Smith's allegations] to be necessary to accomplish the purpose for which the privilege is given."  According to Plaintiff, "if GE's true intent was to share information with Chase and Wells Fargo about the possibility of the theft of account debtor information by PRS employees, Movish could have

24

simply advised Chase and Wells Fargo that GE had received some uncorroborated information regarding possible account debtor information theft at PRS, and that they might want to verify that their customers' accounts had not been compromised." (Pl. Opp'n to Summary Judgment at 22-23.)  The Court agrees with Defendant GE that this is exactly what GE did.  By conveying Smith's letter, along with all the documents Smith had provided, Movish advised Chase and Wells Fargo of the allegations and left them to perform their own investigation.  Again, this is not evidence that Defendant GE did not reasonably believe it was taking steps to respond to a risk of identity theft.

Plaintiff having failed to present evidence from which a reasonable jury could conclude that Defendant GE had abused the qualified privilege protecting its communications to Chase and Wells Fargo, Defendant GE is entitled to summary judgment on Plaintiff's defamation claim (Count II) against it.  See Berrios, 2006 WL 2933899, at *4 (affirming grant of summary judgment on defamation claim where plaintiff failed to provide sufficient evidence to overcome qualified privilege).

> ### 2.   Choice of Law in Defamation Claim Against Defendant Smith

Plaintiff has asked the Court to determine which law should govern Plaintiff's defamation claim against Defendant Smith (Count I) on the issue of fault.  Though the Court proceeds without the benefit of submissions by Defendant Smith the Court

concludes that New Jersey law applies to the defamation claim against Smith.

In a diversity case, choice of law is governed by the rules of the forum state -- in this case, New Jersey. Warriner v. Stanton, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). First, however, the Court must determine if there is an actual conflict. P.V. ex rel. T.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008); Lebegern, 471 F.3d 424, 428 (3d Cir. 2006). "If there is not an actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." Lebegern, 471 F.3d at 428. Plaintiff maintains that there is no actual conflict, because New Jersey law would apply a negligence standard to this claim, as would all other interested states.[10]  If, however, actual malice must be shown under New Jersey law under these circumstances, then there is a conflict and the Court must determine what law to apply.  The Court finds that as to Defendant Smith, New Jersey's

_____

[10] The states relevant to Plaintiff's claim against Smith are Pennsylvania (Smith's residence and the place of her allegedly tortious conduct), New Jersey (Plaintiff's domicil), and Ohio (place of Smith's publication). See System Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1137-38 (3d Cir. 1977). Pennsylvania and Ohio apply a negligence standard to suits brought by private figures a non-media defendant, even when the communication involves an area of public concern. Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa., 923 A.2d 389, 399-400 (Pa. 2007); Gilbert v. WNIR 100 FM, 756 N.E.2d 1263, 1270 (Ohio Ct. App. 2001).

negligence standard applies and thus there is no conflict.

The Supreme Court of New Jersey has recently set forth a test for measuring the degree of fault necessary in a defamation case brought by a private figure[11] against a non-media defendant. Senna v. Florimont, 958 A.2d 427 (N.J. 2008). In Senna the court was faced with two competing businesses on a boardwalk, one of whom broadcast over a public address system to his boardwalk customers that his competitor was a "crook." Id. at 431. The court refused to require proof of actual malice in those circumstances. Id. at 444-46. Rather, the court set out a multi-factor test to determine whether the allegedly defamatory statements involve a matter of public concern, requiring a showing of actual malice not the usual negligence, when the defendant is not the media. Id. at 443-44. The court summarized the new rule as follows:

> [T]o determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech. Content requires that we look at the nature and importance of the speech. For instance, does the speech in question promote self-government or advance the public's vital interests, or does it predominantly relate to the economic interests of the speaker? Context requires that we look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience.

Id. at 444 (citing Dun & Bradstreet, Inc. v. Greenmoss Builders,

---

[11] There has been no suggestion that Plaintiff is a public figure.

Inc., 472 U.S. 749, 761-62 (1985)).

The court then turned to the content and context at issue, and found that the statements were not a matter of public concern.  Id. at 444-46.  Particularly relevant to the court were the facts (assumed for the purpose of summary judgment) that the defendant was a competitor who had threatened to put the plaintiff out of business, and the speech was commercial in nature and designed to further the business interests of the defendant.  Id.  The statements were thus not a matter of public concern and the plaintiff was only required to establish negligence.  Id.

The Court finds the application of the Senna factors to this case relatively straightforward.  The Court is compelled to conclude that, even accepting Plaintiff's allegations as true, Smith's allegations that PRS was not protecting private financial information involved the public's vital interests and were not mere commercial speech.  The risk of identity and monetary theft, if Smith's allegations turned out to be true, are of great import, see supra, note 4.  Nevertheless, the context of Defendant Smith's communications to Defendant GE makes this a claim not involving a matter of public concern.  The facts are such that a reasonable jury could conclude that Smith was a disgruntled former employee with an ax to grind.  Moreover, her decision to notify a PRS client rather than a law enforcement

agency raises doubts as to whether her statements were related to protecting the public interest, and instead suggest that her purpose was to harm PRS by causing them to lose a major client. Her letter to PRS, which includes not only the suggestion that PRS employees were steeling account information, but also accuses particular employees of being abusive to her and using "foul language" and attacks its president for driving an expensive car, minimizes the significance of her theft allegations.  Thus, though one aspect of her allegedly defamatory statements involved an area of great public interest, a disgruntled employee's accusations of general misconduct, directed towards the former employer's customers rather than law enforcement and intertwined with private squabbles do not amount to a matter of public concern and so require only a showing of negligence under New Jersey law.  See Senna, 958 A.2d at 443-46.  There being no conflict with the other jurisdictions involved, New Jersey's law will govern Plaintiff's defamation claim against Defendant Smith.[12]  See Lebegern, 471 F.3d at 428.

_____

[12] The elements of a prima facie defamation under New Jersey, Ohio, and Pennsylvania law are substantially similar.
    For New Jersey they are:  (1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; (5) with actual knowledge that the statement was false or with reckless disregard of the statement's truth or falsity or with negligence in failing to ascertain the truth or falsity; and (6) which caused damage.  Knierim v. Siemens Corp., No. 06-4935, 2008 WL 906244, at *13 (D.N.J. 2008).
    For Ohio they are:  (1) a false and defamatory statement;

C.   **Tortious Interference with Business Relations Against Defendant GE**

Both parties agree that Plaintiff's tortious interference claim against Defendant GE is governed by New Jersey law. Brounstein v. American Cat Fanciers Ass'n, 839 F. Supp. 1100, 1104 n.3 (D.N.J. 1993) (holding that New Jersey law governs tortious interference claim where the plaintiff was a New Jersey resident and suffered the effects of the tortious interference in New Jersey); Fineman v. Armstrong World Indus., Inc., 774 F. Supp. 225, 233 (D.N.J. 1991) (same), rev'd in part on other grounds, 980 F.2d 171 (3d Cir. 1992).  Plaintiff's tortious interference claim, however, cannot survive summary judgment because when such a claim is based on allegedly defamatory statements and the defamation cause of action fails for lack of evidentiary support, the tortious interference claim necessarily

---

(2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; and (5) that was either defamatory per se or caused special harm to the plaintiff.  Gosden v. Louis, 687 N.E.2d 481, 488 (Ohio Ct. App. 1996).

For Pennsylvania they are: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; (7) abuse of a conditionally privileged occasion (once proved by defendant).  42 Pa. Cons. Stat. Ann. § 8343(a).  Moreover, Plaintiff must prove the falsity of Smith's statements if they are "a matter of public concern," as found here, see supra note 4.  Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa., 923 A.2d 389, 396 n.8 (Pa. 2007).

fails as well.  Bainhauer, 520 A.2d at 1175 ("Proof or failure of
proof of the operative facts of the defamation count would,
therefore, completely comprehend the malicious interference
cause.  Thus, if no abuse of privilege is found, then the
'malicious' predicate of the interference count would also
fail."); LoBiondo v. Schwartz, 733 A.2d 516, 530 (N.J. Super. Ct.
App. Div. 1999); Binkewitz v. Allstate Ins. Co., 537 A.2d 723,
729-30 (N.J. Super. Ct. App. Div. 1999) (qualified privilege
applies to tortious interference claim based on defamatory
statements).  Therefore, Defendant GE is entitled to summary
judgment on Plaintiff's tortious interference claim.

### D.   Breach of Contract and Negligence Claims Against Defendant GE

Plaintiff's final two claims of breach of contract and
negligence, based not on defamatory statements, but rather on the
purportedly confidential documents Defendant GE passed to Chase
and Wells Fargo, similarly fail because Plaintiff has presented
no evidence from which a reasonable jury could find that the
production of these documents caused any injury to Plaintiff.
The Court will assume, for the purpose of addressing these two
claims, that all the documents attached to Defendant Smith's
letter were "confidential" for all purposes, that Defendant GE
had an independent common law duty not to reveal this
confidential information, and that Defendant GE gave all the
documents attached to that letter to both Chase and Wells Fargo.

However, the Court rejects Plaintiff's suggestion that Smith's letter itself includes confidential business information protected by the parties' contract[13] or common law governing

―――――――――――――――――

[13] The contract defines "confidential information" as follows:

> All material and information suppled by one party to the other party hereunder or supplied to either party by Account Debtors, including, but not limited to, information concerning either party's objectives, operating procedures, financial results, names or addresses of Account Debtors, computer software, other proprietary technological information and the terms of the Agreement are confidential and proprietary ("Confidential Information").

(Contract, Def. Ex. C.)  This included "confidential information" received from a third party obligated to keep that information confidential.  (Id.)  Under PRS' Employee Manual, Smith was bound by this confidentiality policy:

> The procedures, policies, marketing plans and client or vendor information, ideas and data of PRS, Inc. are property of PRS, Inc. and should never be given to any outside firm or individual except with the appropriate written authorization from an officer of PRS, Inc.

> The protection of confidential information and trade secrets is vital to the interest and the success of PRS, Inc.  Such confidential information includes, but is not limited to the following examples:

>> Computer passwords or commands
>> Customer lists
>> Client or vendor lists
>> Financial Information
>> Market strategies
>>> Computer source codes
>> Pending projects and proposals

(PRS Employee Manual, Pl. Ex. 62G.)

trade secrets.[14]  Plaintiff may not resuscitate its failed defamation claim via negligence or breach of contract.  The Court will not stretch the terms of this Contract to include a letter from a former employee that includes claims that employee was punished in one instance for complaining about harassment and that her boss drove an expensive car (presumably evident to anyone on the road) and stayed in her office.[15]  Contrary to Plaintiff's protests, these allegations do not touch on PRS operating procedures or "work practices" or any other proprietary business interest covered by the Contract or the PRS Employee Manual.  (Contract, Pl. Def. Ex. C; PRS Employee Manual, Pl. Ex. 62G.) They are not, therefore, governed by the confidentiality provisions of the Contract.  (Contract, Def. Ex. C.)

Defendant Smith's allegations are also not the sort of confidential business practices protected by the common law tort for disclosure of business secrets.  Restatement of Torts § 787, cmt. a ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's

―――――――――――――――――

[14] For the purposes of deciding this motion, there is no substantial difference in the law governing trade secrets amongst the various interested states.

[15] Plaintiff does not suggest that Smith's allegations of criminal conduct are somehow confidential and so the Court need not address the obvious public policy concerns resulting from such an argument.

business, and which gives him an opportunity to obtain an
advantage over competitors who do not know or use it"), § 789
("One who, for the purpose of advancing a rival business
interest, procures by improper means information about another's
business is liable to the other for the harm caused by his
possession, disclosure or use of the information.").[16]  Even
applying the broader protections in New Jersey under <u>Lamorte
Burns & Co. v. Walters</u>, 770 A.2d 1158, 1167 (N.J. 2001) as urged
by Plaintiff, allegations that Smith was disciplined after she
complained of harassment and that her boss drove an expensive car
and stayed in her office are not confidential business practices
deserving of protection because these pieces of information, even
if embarrassing or uncomfortable, do not encompass a method or
process having economic value to a competitor if disclosed.  <u>See
id.</u> ("The specific information provided to defendants by their
employer, in the course of employment, and for the sole purpose
of servicing plaintiff's customers, is legally protectable as
confidential and proprietary information.")

There is no evidence from which a reasonable jury could

_____

[16] <u>See</u> <u>also</u> Uniform Trade Secrets Act § 1(4) ("'Trade
secret' means information, including a formula, pattern,
compilation, program device, method, technique, or process, that:
(i) derives independent economic value, actual or potential, from
not being generally known to, and not being readily ascertainable
by proper means by, other persons who can obtain economic value
from its disclosure or use, and (ii) is the subject of efforts
that are reasonable under the circumstances to maintain its
secrecy.")

conclude that Chase and Wells Fargo terminated their contracts
with Plaintiff not because of Smith's allegedly defamatory
allegations, but because of the supposedly confidential material
attached to those allegations.  To review, those documents are
(1) a PRS employee list, (2) a memorandum on PRS letterhead
outlining the "PRS Call Out Policy" (company policy regarding
absence and lateness), (3) a memorandum regarding Target
Financial accounts, (4) a flyer describing the PRS "Check-by-
Phone Contest" (an employee incentive contest) within the
department handling GE accounts, along with contest results, (5)
a memorandum from the PRS GE department managers to GE collectors
regarding documentation to be sent to debtors, (6) three letters
on PRS letterhead signed by Defendant Smith and directed towards
Defendant GE's debtors, (7) one letter from a law firm regarding
a debtor and directed towards Plaintiff, and (8) a series of
hand-written letters from a debtor to Smith.  (Smith Fax, Pl. Ex.
54E.)  The Court, having closely reviewed each document, can find
nothing remotely objectionable in these documents and can see no
reason why these documents would cause either Chase or Wells
Fargo to end their PRS contracts.

More significantly, Plaintiff does not offer a reason for
the two banks to leave PRS, other than because of Smith's
allegedly defamatory statements (which are not protected by
contract or trade secrets law).  In this circumstance, the mere

35

timing of the departures of Chase and Wells Fargo do not, without more, create the inference from which a reasonable fact-finder could conclude that these banks ended their business with PRS because of the benign documents they received from Movish. Defendant GE is entitled to summary judgment on these final two claims as well.

**III. CONCLUSION**

For the foregoing reasons, the Court will grant summary judgment in favor of Defendant GE as to all claims.  Further, the Court will apply New Jersey law to Plaintiff's defamation claim against Defendant Smith.

The accompanying Order will be entered.


**June 16, 2009**                          **  s/ Jerome B. Simandle  **
Date                                        JEROME B. SIMANDLE
                                            United States District Judge